UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

STEVEN KOLCUN,

        **Plaintiff,**                                   Case No. C2-04-CV-1079
                                                                JUDGE GREGORY L. FROST
        **v.**                                                  Magistrate Judge Abel

**NATIONWIDE INS. CO.,**

        **Defendant.**

## OPINION & ORDER

Plaintiff Steven Kolcun ("Kolcun") asserts that Defendant Nationwide Insurance Company ("Nationwide") terminated his employment in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, ("ADA"), Ohio Revised Code Chapter 4112, and public policy. (Doc. # # 1, 14, 32, 33). Nationwide has filed a motion for summary judgment on each of Kolcun's claims, Kolcun has filed a response in opposition, and Nationwide has filed a reply. (Doc. # # 23, 28, 35). For the following reasons, the Court **DENIES** Nationwide's motion on Kolcun's ADA and parallel state disability discrimination claims, but **GRANTS** the motion with respect to Kolcun's remaining claims. (Doc. # 23).

## BACKGROUND

Kolcun began working for Nationwide in its auditing department on November 19, 1984. (Kolcun Dep. 65, 161). Several years later, Nationwide promoted Kolcun to a claims investigator in the Special Investigations Unit ("SIU"). *Id.* That job required Kolcun to investigate suspicious property and casualty claims. After Kolcun completed his review of such claims, he was charged with preparing a report outlining his findings and recommendations.

1

Kolcun forwarded his reports to a claims representative, who would then determine if the claim was legitimate and whether the policyholder was entitled to benefits under the policyholder's plan.  (Kolcun Dep. 139-140).  Kolcun remained in this position until his termination on August 4, 2003.

Nationwide kept two files on Kolcun.  The first was an incident file.  The second was a personnel file.  Kolcun was aware of the latter; he was not aware of the former until discovery was completed in this case.  (Kolcun Dep. 39-42).  Kolcun's incident file consisted of several documents.  The first was a July 31, 1997 letter from Nancy Smith-Stinson ("Smith-Stinson"), a secretary who worked with Kolcun in the SIU department, to Terry Bradford ("Bradford"), Kolcun's supervisor at the time.  (Bradford Dep. 57-60, Ex. 4).  The letter highlighted some of Smith-Stinson's interactions with Kolcun that made her feel "uncomfortable."  (Bradford Dep. Ex. 4).[1]  For example, Smith-Stinson wrote that Kolcun asked if he could use her house to "hide out" to do survelliance work on a woman Kolcun alleged was stalking him.  *Id.*  Kolcun also asked Smith-Stinson if she had a boyfriend who was home during the day.  *Id.*  Next, Smith-Stinson recounted several negative comments Kolcun had allegedly made to her regarding individuals of different races.  *Id.*  Smith-Stinson requested that Bradford keep her concerns confidential, and suggested that Kolcun submit documentation to her via fax, as all of the other investigators did, in order to limit Kolcun's personal contact with her.  *Id.*  Bradford referred the matter to Nationwide's human resources department, but the situation resolved itself when Smith-Stinson took an extended medical leave.  (Bradford Dep. 57, 60; Kolcun Dep. 180).

---

[1] Neither party asserts that the document is not authentic or that it constitutes hearsay.  Indeed, it appears to be a business record.

Kolcun did not "hear about" Smith-Stinson's complaint until May 1999, when he applied for a promotion. (Kolcun Dep. 173). A document referring to Smith-Stinson's July 31, 1997 memorandum was incorrectly sent to Nationwide employee Pat Wyatt ("Wyatt") instead of Bradford. Wyatt, a claims investigator, read the document and apparently informed Kolcun of its contents. *Id.* at 178, 188-190. As a result, Kolcun called Smith-Stinson to ask her about her complaint. *Id.; see also* Doc. # 28 Ex. 7. When Smith-Stinson declined to speak with him on the topic, Kolcun contacted Robert Smith ("Smith"), his supervisor at that time. *Id.* at 108, 177.

Smith investigated the matter by speaking with Bradford and Human Resources Manager Lorie Kuyoth ("Kuyoth"). (Doc. # 28 Ex. 6).[2] Ultimately, Smith concluded that the matter should not be pursued and he documented his examination of the matter in a May 21, 1999 memorandum that was placed in Kolcun's incident file. *Id.* That memo summarized Smith's conversations with Bradford and Kuyoth and stated that Bradford described Kolcun as a "ticking time bomb" with an unprofessional, arrogant, and threatening attitude and demeanor. *Id.* Smith discounted Bradford's comments because of the well-known personality conflict between Bradford and Kolcun. *Id.*

Smith's document also questioned Bradford's recitation of the events at a meeting that took place shortly before he completed the May 21, 1999 memorandum. Specifically, Bradford told Smith that he had asked Kolcun to leave the meeting because Kolcun had "gone ballistic" at the meeting. Smith contacted O.G. Garrison ("Garrison"), another individual who was present at the meeting, about Bradford's description of Kolcun's behavior. Garrison told Smith that

---

[2] Neither side raises an evidentiary objection to the document, which appears to be a business record.

3

Kolcun had not "gone ballistic" at the meeting, had not raised his voice, and was not asked to leave the meeting. *Id.* Recognizing the admitted personality conflict between Bradford and Kolcun, Smith declined to further pursue Bradford's comments but he did meet with Kolcun to discuss the importance of professionalism. *Id.*; *see also* Kolcun Dep. 193. Consequently, Smith told Kolcun that there was no harassment complaint in his file so Kolcun dropped the matter. (Kolcun Dep. 177). Kolcun did not learn about Smith-Stinson's July 31, 1997 letter until Nationwide produced it in discovery for this matter. *Id.* at 173.

Contained within his personnel file was a March 21, 2002 "One-Time notice" from Bradford to Kolcun. That document recited a relevant portion of Nationwide's computer usage policy, and further provided, in relevant part:

> Steve, ... [y]our excessive and inappropriate use of company equipment and systems including email for personal reasons is unacceptable work behavior and must stop immediately.
> You have also gave [*sic*] another employee [Scott Jeggle ("Jeggle")] permission and unlimited access to use your office computer, your NWIDOM password, your Internet id and password for their [*sic*] personal use. The other employee was seen using your computer and you were not in the office that day. When the other employee was questioned they [*sic*] indicated that you were friends and that you had given him your id and password so he could check his e-mails. You have admitted allowing this, despite your knowledge that the employee had his internet access previously revoked [*sic*] for excessive personal use. Sharing of passwords and allowing others unlimited access to your company equipment, such as your computer, are serious breaches of confidentiality. This is unacceptable behavior and must stop immediately.
> This letter is to place you on a One-Time Notice [*sic*] advising you that you are in violation of company policy. If this behavior or a similar violation is exhibited again during your employment at Nationwide, it will be investigated and if in violation again during employment at Nationwide, termination of your employment could result.
> Attached is a copy of the Policy Guide regarding Unacceptable Work Behavior and Misuse of Electronic Communications. We can discuss any questions you have regarding what is inappropriate and appropriate use of the electronic communication system.

4

(Kolcun Dep. Def. Ex. I; Kolcun Dep. 37-39, 56-57). Both Kolcun and Bradford signed the document on April 8, 2002. *Id.* Nationwide terminated Jeggle's employment as a result of the incident but Kolcun kept his job.

Approximately one year later, Brian Krawczyk ("Brian") replaced Bradford as Kolcun's supervisor. (Brian Aff. ¶¶ 1, 2). In July 2003, two telephone conversations occurred between Kolcun and Brian. Each individual has a different recollection of the calls. The first call happened on July 28, 2003, and the second on July 31, 2002. On August 4, 2003, Brian authored a memorandum that was placed in Kolcun's incident file regarding the calls. (Doc. # 23 Ex. A to Brian Aff). Entitled "Unacceptable Behavior–Steve Kolcun" the memo provided:

> On July 28, 2003, I received a telephone call from Special Investigator Steve Kolcun regarding an assignment he received in the Cincinnati market. Steve asked "why the hell' was he receiving a Cincinnati claim. I explained to Steve that he had received the assignment because Investigator Deb Shaw, who customarily handles the Cincinnati Market [*sic*], had broken her leg and would be out of work for an indefinite time. Steve was very upset about getting the claim, said it fell outside of his "territory" and told me that I should have sent a note out to the unit about Deb. I explained that I had just heard from Deb, and was in a meeting and did not have access to my e-mail, but when I got back into the office, I would advise the rest of the district about Deb's injury. I also explained to Steve that regardless of specific territories, each PH investigator can and would handle claims anywhere in the OH. I advised he was no exception to this practice.
>
> On July 31, 2003, I received another call from Steve. Steve immediately asked again "why the hell" was [he] receiving Cincinnati claims. As I had done a few days prior, I said simply that it was due to Deb's injury. Steve was very angry, became verbally abusive, and began to shout. He very loudly and angrily told me I should hold those claims until Deb's return instead of giving them to him because it was outside of his territory. I immediately warned Steve about his tone of voice. I then advised him we could not "hold" claims for assignment, and his territory is

5

> OH. I further explained as I had on the prior Monday, that despite customary territories, all of the investigators could and did take claims anywhere in the state. Despite my warning about his use of profanity, and unprofessional tone, Steve then said, "God damn it Brian, I don't think you understand!" I then advise[d] Steve that his behavior and language was unacceptable , and asked him to come to my office in Gahanna to speak with me in person. Steve said he could not do that because he had an EUO scheduled, and using the same angry tone, then said, "you can't make me come see you anyway." I explained that he was not correct, and that if I asked him to do something, he would need to comply. I then told Steve that as an alternative, he should come to my office on Monday the 4th of August at 9 a.m. to discuss the situation.
>
> Steve's tone and volume of voice remained consistent throughout the entirety of the conversation until the last minute or so, at which point he became slightly more calm. He said he was getting too many Cincinnati claims. I advised that if that was the case, he should have discussed this with me at the outset. I also said that his manner of communicating with me had been unprofessional and unacceptable, and that we would discuss the issue further on Monday. I then called lead Investigator Arthur Hohman, and asked him not to assign any further claims to Steve.

(Doc. # 23 Ex. A to Brian Aff). Additionally, Brian summarized the two conversations in his affidavit. Specifically, Brian stated that during the telephone calls Kolcun "used inappropriate language towards [him] and questioned his work assignments." (Brian Aff. ¶ 3). Brian continued that during the July 31, 2003 conversation, Kolcun "was extremely argumentative and his language was abusive ... Kolcun took strong exception to the fact that he was being asked to cover claims from the Cincinnati area despite providing him with an explanation why he received the claim [sic] and providing him with my expectation that he cover the claims three days earlier." *Id.* at ¶ 4.

In contrast, Kolcun described the July 28, 2003 call in the following manner in his deposition:

> When I called Brian on that Monday, July 28th, I called and

> asked him, I said, Brian, I just got this Cincinnati claim. Am I the–let me back up a little bit.
>
> Sometimes when we were called to assist in other areas, it was not uncommon that the same assignment would be given to two investigators. The investigator in that area and then also the person outside. Keeping in mind that maybe they need assistance, maybe they were on vacation or whatever. Okay. So it became a practice of a lot of the investigators to check with one another. So I called Debra. I couldn't get an answer from her.
>
> So I called Brian and I said, Brian, I got this claim in Cincinnati, is this right. The guy went off on me. You're an Ohio investigator. You'll go where I tell you, et cetera. I'm not questioning that. I'm just questioning, you gave me an assignment in another area. I'm just making sure that not two of us are working on it. Well, there can't be two of you working on it because Debra is out with a broken leg.
>
> And with that I said, I didn't know that. And I said, is there a note that's been sent out about her breaking her leg and she's going to be off or anything like that. No, I haven't done that. I said, well, don't you think that might be a good idea so that you let the other investigators know at least to give her a call and see how she's doing. We didn't know that.

(Kolcun Dep. 129-131). Kolcun continued by testifying that he did not (1) "use any tone of voice;" (2) say "what the hell"; (3) say that Brian could not make him go see Brian; (4) raise his voice; (5) get "argumentative"; and (6) get upset during the July 28, 2003 telephone call. *Id.* at 222-223, 229. Rather, Kolcun testified that it was Brian who raised his voice and became very irritated. *Id.* at 224.

Kolcun also recounted the July 31, 2003 call differently than Brian:

Q: So your voice was raised enough at least to be heard across a couple of cubicles?
A: Yes.
Q: Was Brian's voice raised?
A: Yes.
Q. Tell me everything you remember about the conversation.
A. I called Brian. I had just saw [*sic*] that I had gotten three more claims in the

7

>Cincinnati area, and they came from Art Hohman. So I called Art. And I said to Art, I said, Art, you just gave me three more claims in Cincinnati. I was just down there for two others. Are you sure I'm supposed to be getting all these claims in Cincinnati. And Art repeated to me that Brian had said I am to get all Cincinnati claims. So Art was doing what he was told.
>
>So I turned around and called Brian. I called him and I indicated that, Brian, you gave me three more claims. He started in about me being an investigator in Ohio and that, you know, I go where I'm told. I said, I don't mind but–and again, our voices are starting to raise a little bit. And in this discussion which lasted all of three minutes, I said I'm being overworked. You got to get me some help. He says, you'll do what your told.
>
>He says, well, why don't you come over to the office now and we'll talk about it. And I said, I can't do that. And before I could answer, he says, you will do what I tell you. And at that point I said, you don't understand. I have a deposition here in a half hour. And it was 10:30. 11:00 was my deposition. I don't care I want you over here now. And I said, you're not listening to me, I have a deposition. And again, our voices are both raised.
>
>And at that point, I said to him, damn it Brian, I've got a deposition. I can't come at 11:00. I don't think the guy is going to show up. I can leave here at 11:15 and be there by 11:45.
>
>And at that time, I caught myself, he caught himself and we calmed down to the point where we could talk. He said, why don't you call me when the deposition is over. I said, I'll do that and we can talk about this and get this all straightened out.
>
>I called him at 11:15. He informed me that he couldn't meet with me because he just got called into a meeting. I said, it's important enough, what time is your meeting over with, I'll come over and talk to you. He said, I don't know when it's going to be over. What about tomorrow, being Friday. I said I have a vacation day, but I'll come in. It's important that we get this straightened out. He said, no, take your vacation, we'll just talk about it on Monday. And that was the end of it. And we set up an appointment for Monday.

(Kolcun Dep. 23-27). Kolcun denied that he shouted, became verbally abusive, and angry during that conversation. *Id.* at 226. Kolcun also stated that Brian did not warn him about his tone of voice or that he was acting unprofessionally. *Id.* at 227, 231. Furthermore, while he admitted to saying "damn it," Kolcun denied saying "God damn it." *Id.* at 227-228.

On August 4, 2003, Kolcun met with Brian, Kuyoth, and Lead Investigator Ron Richards

8

("Richards"). (Doc. # 23 Ex. B to Brian Aff.; Kolcun Dep. 232-237). Brian summarized the events of that meeting in a memorandum he penned that same day. (Doc. # 23 Brian Aff. Ex. B). Entitled "Termination of Steve Kolcun–SIU," the memorandum states:

> On today's date, I met with ... Kolcun, ... Richards, and ... Kuyoth, to discuss unprofessional and unacceptable behavior displayed by ... Kolcun during a telephone conversation with me. The phone conversation between Steve and I took place on Thursday, July, 31st. During that call, Steve was verbally abusive toward me, used profanity, and was argumentative about having to handle cases in the Cincinnati market. During that phone conversation, Steve also made an insubordinate comment to me that I "could not tell him what to do."
>
> During our meeting today, I provided Steve with an opportunity to tell me why he expressed himself the way he had during our phone conversation. Steve said that he was frustrated that day, and had been busy. He then said that his manner of speaking to me was completely wrong, and he described his own behavior as "undisciplined." He further assured me that similar situations would not occur in the future. I asked Steve if there had been any particular external stress that would lead to a higher level of frustration in his life, and he reported to me that there had been none. After listening to what he said, I thanked Steve for his candor. At that time, I met privately with ... Richards and ... Kuyoth to discuss Steve's explanation of his behavior.
>
> During our brief meeting, Ron, Lori [*sic*], and I discussed the One Time Notice that had been issued to Steve last year for Misuse of Company Equipment/Unacceptable Behavior. We also discussed the various other documented allegations of unprofessional or unacceptable behavior apparent in his employment file. Based upon Steve's history of unacceptable behavior, the recurrence of unacceptable behavior on July 31st, and the absence of any significant extenuating circumstances that could have lead to a heightened frustration level, I made the decision to terminate Steve's employment.
>
> Lori [sic], Ron and I then again met with Steve. I explained to Steve that I had reviewed his employment file in full, and considered his explanation for the behavior he exhibited on July 31st. I also considered his assurance that such behavior would not be exhibited in the future. I told Steve that given his history of behavior problems, I was not comfortable that a similar exhibition of unacceptable behavior would not occur in the future. I explained that for that reason, I had made the decision to terminate his employment.
>
> Steve became immediately apologetic, continued to assure me that the

> behavior would not occur again, and asked me to reconsider. I explained that I understood his feelings about my decision, but my decision was final. Steve continued to debate the decision with Ron, Lori [*sic*] and myself. I again advised Steve that the decision was final, and asked that he cooperate in relinquishing all company provided equipment. Steve ultimately complied with this request, and the meeting ended.

*Id.*

Kolcun disputed Brian's recitation of the August 4, 2003 meeting at his deposition. Specifically, Kolcun denied telling Brian that he could not tell him what to do during the July 31, 2003 telephone call. (Kolcun Dep. 232). In addition, Kolcun stated that Brian did not ask if external stress was causing Kolcun's behavior. *Id.* at 233. Moreover, Kolcun testified that Brian never told him that he had reviewed Kolcun's employment file. *Id.* at 235.

Brian's decision to terminate Kolcun's employment was final. (Brian Aff. ¶ 12). As a result, Kolcun filed a charge of employment discrimination with the United States Equal Opportunity Commission ("EEOC"). The EEOC issued its right to sue letter on August 17, 2004. (Doc. # 1 Ex. A).

Kolcun then timely filed this suit, asserting that Nationwide had violated the Age Discrimination in Employment Act, ("ADEA"), 29 U.S.C. § 621 *et seq.*, the ADA, and the parallel state provisions found in Ohio Revised Code Chapter 4112. (Doc. # 1). In addition, Kolcun alleged that Nationwide had violated public policy by unlawfully terminating him on the basis of his age and disability. *Id.* Lastly, Kolcun asserted that Nationwide had wrongfully used his persona for a commercial purpose in violation of Ohio Rev. Code § 2741.02. *Id.* Subsequently, the Kolcun moved to sever his federal and state statutory age discrimination claims and his claim for wrongful termination in violation of public policy based on his age

10


discrimination claims from his Complaint.  The Court granted Kolcun's motions, and those claims were dismissed.  (Doc. # # 14, 32, 33).

Nationwide now moves for summary judgment on all of Kolcun's remaining claims.  (Doc. # 23).  It is to an examination of that motion and its related briefing that this Court now turns.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court must therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case.  *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52). However, in ruling on a motion for summary judgment, "a district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

## DISCUSSION

I.  **FEDERAL AND STATE STATUTORY DISABILITY DISCRIMINATION CLAIMS**

The ADA prohibits an employer from discriminating against a "qualified individual with a disability" because of that individual's disability. 42 U.S.C. § 12112(a). Similarly, Ohio Rev. Code § 4112.02(A) makes it an unlawful discriminatory practice "For any employer, because of the . . . disability . . . of any person, to discharge without just cause . . . or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Accordingly, Ohio courts look to regulations and cases interpreting the ADA for guidance in interpreting Ohio law. *See Columbus Civil Service Comm. v. McGlone*, 697 N.E.2d 204, 206-07 (1998) (citing *Little Forest Med. Ctr. v. OCRC*, 575 N.E.2d 1164 (Ohio 1991)); *see also Hoffman v. Fidelity Brokerage Servs.*, Inc., 959 F.Supp. 452, 457 n. 1 (S.D. Ohio 1997) ("The essential elements of a claim under the ADA and the Ohio handicap discrimination statute are the same").

The existence of a genuine issue of material fact prevents the Court from embarking on an analysis of Kolcun's disability discrimination claims. As set forth above, Kolcun and Brian each recite differing versions of the July 2003 telephone calls. Thus, the Court is unable to

determine what, exactly transpired during those conversations and the Court is therefore further prevented from discerning if the telephone calls were the reason Nationwide terminated Kolcun. Consequently, the Court **DENIES** Nationwide's motion for summary judgment on Kolcun's federal and state statutory discrimination claims. (Doc. # 23).

## II. PUBLIC POLICY DISABILITY DISCRIMINATION CLAIM

Kolcun also asserts a claim for wrongful discharge in violation of Ohio public policy based upon his discrimination claims. (Doc. # 1). The Court has subject matter over this claim pursuant to 28 U.S.C. § 1367. In deciding supplemental jurisdiction claims, state substantive law provides the rules of decision. 28 U.S.C. § 1652; *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). In applying state law, the Sixth Circuit follows the law of the State as announced by that State's supreme court. *Ray Industries, Inc. v. Liberty Mut. Ins. Co.*, 974 F.2d 754, 758 (6th Cir. 1992).

Initially, the Court notes that Kolcun failed to respond to Nationwide's motion for summary judgment on this claim. (Doc. # 28). Thus, it appears that Kolcun has abandoned that claim because he did not satisfy his burden and the Court **GRANTS** Nationwide's motion for summary judgment on Kolcun's wrongful discharge public policy claim. *See Zamos v. Asset Acceptance, LLC*, 2006 U.S. Dist. LEXIS 21793, at *14 (N.D. Ohio 2006) (stating "While Plaintiff raised such claims in his supplemental complaint, he fails to even mention these claims in his response to Defendants' motion for summary judgment. Accordingly, Plaintiff fails to meet his reciprocal burden on summary judgment as to this claim and appears to have abandoned the claim. Ergo, the Court grants Defendants' motion for summary judgment on this cause of action"). *See also Smith v. Meyer Builders*, 2006 U.S. Dist. LEXIS 8334, at *42 (S.D. Ohio

2006) (holding same).

Even assuming, arguendo, that Kolcun had addressed Nationwide's motion on his public policy claim, the Court would still have granted summary judgment in Nationwide's favor on that portion of Kolcun's Complaint. Although employment relationships in Ohio are generally governed by the common-law doctrine of employment at will, Ohio "public policy warrants an exception to the employment at will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute." *Greeley v. Miami Valley Maint. Contractors, Inc.*, 551 N.E.2d 981, 986 (Ohio 1990). The elements of the tort are:

> 1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).
>
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).
>
> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).
>
> 4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Painter v. Graley*, 639 N.E.2d 51, 57 at n.8 (Ohio 1994) (citing H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398-399). The Ohio Supreme Court held that the clarity and jeopardy elements are questions of law, and that the causation and justification elements are questions of fact. *Collins v. Rizkana*, 652 N.E.2d 653, 657-58 (Ohio 1995).

The jeopardy element is the sole point of contention in the case *sub judice*. (Doc. # 23 at 18). The jeopardy element of the tort is not met "where the statute in question provides its own

14

adequate remedies." *Schmauch v. Honda of Am. Mfg., Inc.*, 311 F. Supp. 2d 631, 634 (S.D. Ohio 2003). Stated simply, the Ohio Supreme Court held that "there is no need to recognize a common-law action . . . if there already exists a statutory remedy that adequately protects society's interests." *Wiles v. Medina Auto Parts*, 773 N.E.2d 526, 531 (Ohio 2002).

The Sixth Circuit elaborated on the jeopardy analysis in *Carrasco v. Nomtc, Inc.*, 2004 U.S. App. LEXIS 25033 (6th Cir. 2004). In that case, the Sixth Circuit held that to establish the jeopardy element, a plaintiff must show that there is no other recourse or remedy available. *Carrasco*, 2004 U.S. App. LEXIS 25033, at *20. In so holding, the court noted that the Ohio Supreme Court had held:

> An analysis of the jeopardy element necessarily involves inquiring into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful discharge claim. . . . Where, as here, the sole source of the public policy opposing the discharge is a statute that provides the substantive right and remedies for its breach, 'the issue of adequacy of remedies' becomes a particularly important component of the jeopardy analysis. . . . Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests.

*Carrasco*, 2004 U.S. App. LEXIS 25033, at *20-21 (citing *Wiles*, 773 N.E.2d at 531). In essence, then, *Carrasco* requires the Court to examine the adequacy of remedies available under other statutes, not just the adequacy of remedies available under the specific statute or statutes that a plaintiff elected to proceed under.

The Court's distinguished colleague Judge James L. Graham recently completed that analysis and concluded that the remedies available under the ADA and Ohio Rev. Code Chapter 4112 were adequate to protect society's interest against age discrimination. *Dillbeck v. Huntington Nat'l Bank*, 2005 U.S. Dist. LEXIS 10273, at *18 (S.D. Ohio 2005) (holding "[t]he

statutory remedies that exist under the ADA and O.R.C. § 4112 are adequate to protect society's interest in discouraging employers from engaging in discrimination and further provide sufficient compensation to the victims of such discrimination").

This Court agrees with Judge Graham's conclusion and therefore **GRANTS** Nationwide's motion for summary judgment on Kolcun's claim for wrongful discharge in violation of public policy. (Doc. # 23).

### III.     USE OF KOLCUN'S PERSONA FOR A COMMERCIAL PURPOSE

Lastly, Kolcun asserts a claim under Ohio Rev. Code § 2741.02. (Doc. #1). Specifically, Kolcun claims that Nationwide failed to remove his outgoing voicemail message on his work telephone number after his termination so that Nationwide was able to capitalize on his reputation. *Id.*; *see also* Kolcun Dep. 248-253. Nationwide contends that summary judgment is proper on this claim because Kolcun, while employed as an investigator, did not generate business for Nationwide. (Doc. # 35 at 7).

Section 2741.02 of the Ohio Revised Code prohibits the use of "any aspect of an individual's persona for a commercial purpose during the individual's lifetime or for a period of sixty years after the date of the individual's death." O.R.C. § 2741.02(A). "Persona" means "an individual's ... voice ... if ... [it] ha[s] commercial value." O.R.C. § 2741.01(A). The statute defines "commercial purpose" as the use of an individual's persona "in connection with" a "product, merchandise, goods, [or] services." O.R.C. § 2741.01(B).

Kolcun testified at his deposition that his voicemail account remained active for almost a year after his termination. (Kolcun Dep. 249). Kolcun's recorded message identified Kolcun as

16

an investigator at Nationwide, asked callers to leave a message, and stated that Kolcun would return the call. *Id.* at 252. Kolcun checked his messages on that account each month during the year after he was fired but admitted that he did not ask Nationwide to deactivate his account. *Id.* at 249-250.

Kolcun argues that his voice had commercial value because he had a good reputation as an investigator. *Id.* at 248; Doc. # 28 at 19. Kolcun continues by stating that because his voicemail account remained active, Nationwide was able to "use Kolcun's strong reputation with vendors, contacts with police departments, and fire investigators for Nationwide's benefit." *Id.*

The Court concludes that Kolcun's mere allegations are without merit, as Nationwide correctly points out that he failed to establish that Nationwide used his voice in connection with services for a commercial purpose as the statute requires. (Doc. # 35 at 7). In addition, Kolcun knew that Nationwide had not terminated his voicemail account but he chose not to inform Nationwide of that fact. Thus, the Court **GRANTS** Nationwide's motion for summary judgment on Kolcun's claims under O.R.C. § 2741.02. (Doc. # 23).

## CONCLUSION

The Court **DENIES** Nationwide's motion for summary judgment on Kolcun's federal and state statutory disability claims. (Doc. # 23).

The Court **GRANTS** Nationwide's motion for summary judgment on Kolcun's wrongful discharge in violation of public policy claim. (Doc. # 23).

The Court **GRANTS** Nationwide's motion for summary judgment on Kolcun's claim under O.R.C. § 2741.02. (Doc. # 23).

The parties are reminded to review the Court's Pretrial Order (Doc. # 9) in preparation for the upcoming June 27, 2006 final pre-trial conference.

**IT IS SO ORDERED.**

   /s/   Gregory L. Frost

**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**